CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JAN 31 2022

JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| JERRY W.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 4:20-cv-00046 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:   Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant.[2] | ) | |

Plaintiff Jerry W. asks this Court to review the Commissioner of Social Security's final

decision denying his applications for disability insurance benefits ("DIB") and supplemental

security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–

434, 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 8.

Having considered the administrative record, the parties' filings, and the applicable law, I cannot

find that the decision is supported by substantial evidence. Accordingly, I respectfully

recommend that the decision be reversed and the case be remanded under the fourth sentence of

42 U.S.C. § 405(g).

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted for the former Commissioner, Andrew M. Saul, as
the named defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a).[3] Social Security ALJs follow a

five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence,

whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration

requirement; (3) has an impairment that meets or equals an impairment listed in the Act's

regulations; (4) can return to his or her past relevant work based on his or her residual functional

capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461

U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§

404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*,

858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not

disabled. *See id.*

## II. Procedural History

Jerry previously filed applications for DIB and SSI in August 2014. Administrative

Record ("R.") 15, 133, ECF No. 14. Those claims were denied initially in December 2014, and

upon reconsideration in April 2015. R. 133. In July 2016, Jerry testified at an administrative

hearing before ALJ Brian P. Kilbane. R. 108–129. ALJ Kilbane issued a written decision

denying Jerry's claims on August 30, 2016, R. 133–47, and the Appeals Council declined to

review that decision in May 2017. R. 153–56. *See* R. 170, 196. ALJ Kilbane's decision is the

"final decision" of the Commissioner that Jerry was not disabled on or before August 30, 2016.

*See* R. 15, 154.

Jerry again applied for DIB and SSI in November 2017, alleging that he became disabled

on June 24, 2015, because of a "bad back, no toes on left foot, [and] diabetes." R. 273; *see* R.

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

247–59. He was fifty-one years old, or a "person closely approaching advanced age" under the regulations, when he filed these claims. *See* R. 159, 169; 20 C.F.R. §§ 404.1563(d), 416.963(d). Disability Determination Services ("DDS"), the state agency, denied both claims initially in May 2018, R. 159–81, and upon reconsideration in July 2018, R. 182–209. In August 2019, Jerry appeared with counsel and testified at an administrative hearing before ALJ L. Raquel BaileySmith. R. 33–71. A vocational expert ("VE") also testified at this hearing. R. 56–68.

ALJ BaileySmith issued an unfavorable decision on September 11, 2019. R. 15–26. She first found "no evidence" that Jerry "further appeal[ed]" ALJ Kilbane's decision after the Appeals Council declined to review it in May 2017, and, as such, that decision was the final decision of the Commissioner that Jerry was not disabled on or before August 31, 2016. *See* R. 15. Thus, her written decision would "address only the unadjudicated period beginning on August 31, 2016." *Id.* ALJ BaileySmith then found that Jerry had not engaged in substantial gainful activity since August 31, 2016, and that he met the Act's insured-status requirements through December 31, 2018.[4] R. 18. ALJ BaileySmith found at step two that Jerry suffered from the following "severe" impairments during the relevant time: status-post transmetatarsal amputation of the left foot; diabetes mellitus II with peripheral neuropathy; lumbar degenerative disc disease; and obesity. *Id.* None of those impairments met or medically equaled a relevant Listing. R. 19–21 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02, 1.04, 8.04, 9.00, 11.14).

---

[4] The latter date is called the date last insured, or "DLI." *See Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012). "To qualify for DIB, [the claimant] must prove that [he or] she became disabled prior to the expiration of [his or] her insured status." *Johnson*, 434 F.3d at 655–56. A claimant's insured-status is not relevant to an SSI claim. *See Redditt v. Colvin*, No. 7:13cv391, 2014 WL 2800820, at *4 n.3 (W.D. Va. June 18, 2014); 20 C.F.R. §§ 416.202, 416.501

ALJ BaileySmith then evaluated Jerry's residual functional capacity ("RFC") and determined that he could perform "light" work[5] with additional limitations. R. 21. He could "occasionally push and pull with the bilateral lower extremities, [and] occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs," but could "never climb ladders, ropes or scaffolds." *Id.* Jerry could "frequently handle, finger and feel bilaterally," and he could "have no more than occasional exposure to extreme cold, extreme heat, hazards and vibration." *Id.* The ALJ then found that Jerry was unable to perform his past relevant work, R. 24–25, but he could perform the requirements of certain "light" jobs existing in significant numbers in the national economy, including garment bagger and "table assembler of paper goods," R. 25–26 (citing R. 61–63). She therefore found Jerry "not disabled" from August 31, 2016, through the date of her decision. R. 26. The Appeals Council denied Jerry's request for review, R. 1–3, and this appeal followed.

### III. Discussion

Jerry argues that ALJ BaileySmith's credibility determination regarding his claims of back and foot pain and problems walking is not supported by substantial evidence. *See generally* Pl.'s Br. 2–5, ECF No. 18-1. Specifically, he contends that the ALJ mischaracterized his course of treatment, *id.* at 3–4, and erroneously found that Jerry "declined both physical therapy and injections," *id.* at 4. According to Jerry, "the ALJ here failed to take into full account evidence of [his] treatment history that supports his complaints of debilitating pain." *Id.* at 4 (citing *May v.*

---

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

*Colvin*, No. 5:14cv10, 2015 WL 195894 (W.D. Va. May 1, 2015)). Jerry's argument is persuasive.

A.    *Summary*

1.    *Relevant Medical Evidence*

In February 2016, prior to the period under adjudication, Jerry had his left big toe amputated after being diagnosed with osteomyelitis, which resulted from type II diabetes mellitus. *See* R. 510–15. At a post-operative visit in April, Jerry "continue[d] to have some discomfort with his left foot but admit[ted] to improvement." R. 505. Robert Schopf, D.P.M., noted that Jerry had been prescribed oxycodone previously, but that it would now be "reduced to Norco," and that Jerry would "not receive any more opiates at th[at] point." *Id.* By July, Jerry again began experiencing issues with his left foot, complaining to Dr. Schopf of continued swelling after the amputation of his left great toe. R. 490. On examination, Jerry had palpable dorsalis pedis pulses, a protective sensation, and "[m]inimal circumferential swelling of the forefoot," but his ankle and subtalar joint ranges of motion were pain-free. R. 492. Dr. Schopf "assured [Jerry] that his swelling was postsurgical and quite normal as long as there was no erythema or fluctuance present." *Id.* He also noted that Jerry's insurance carrier refused to pay for adaptive footwear and that Jerry could not afford to buy the prescription shoes himself. *See* R. 492–93.

Later in July, Jerry presented to the Carilion Clinic with lower back pain and pain, numbness, and tingling to his right side. R. 487–89. Kaitlin Seelig, P.A., noted that Jerry had lumbar decompressive back surgeries in 1999 and 2002, and that he "has tried PT, chiropractic treatments, and pain medications for the pain for the past 4 years without relief." R. 487. Jerry reported that he was not taking narcotic pain medication, and that he had "been going to PT for 4

weeks but [it] ha[d] only been helping somewhat." *Id.* On his review of systems, Jerry attributed

a gait disturbance to his toe. R. 489. On exam, although Jerry displayed a steady gait, it was slow

and antalgic, and he had a positive straight leg raising test on the right. *Id.* His sensation was

intact bilaterally, and he had full motor strength in all major muscle groups. *Id.* P.A. Seelig

ordered an MRI, instructed Jerry to follow up in four-to-six weeks, and noted that "PT has not

helped [Jerry's] pain, but [he] could consider an ESI on the right side at [his] next visit." *Id.* She

diagnosed Jerry with right-sided sciatica and bilateral lower back pain and prescribed Percocet.

*Id.* In September, Jerry cancelled a follow-up appointment because his insurance carrier denied

coverage for the MRI. R. 486.

In March 2017, when Jerry again presented to the Carilion Clinic, it was noted that

insurance denied the MRI because Jerry had not seen his physician in person within the prior

sixty days. *See* R. 485. Jerry said his pain was worse than at his last office visit in July 2016. R.

483. He had "tried PT with little relief," and said that "he could barely walk after his sessions."

*Id.* Jerry reported experiencing "pain that shoots down the back and the lateral aspect of the right

leg and goes all the way down to the right foot," that was "accompanied by numbness and

tingling." *Id.* Jerry also said he had to lean on a shopping cart "when shopping because he [could

not] walk long distances." *Id.* He again reported a gait disturbance. R. 484. Jerry's examination

findings largely remained the same, but his gait was no longer noted to be slow and was now

observed to be steady and only "slightly" antalgic. *Id.* P.A. Seelig again ordered an MRI, and she

ordered an X-ray of Jerry's lumbar spine and told Jerry to follow up in five to six weeks. R. 485.

An X-ray of Jerry's lumbar spine revealed "[m]ild levoscoliosis [] centered at L2,"

"[b]ilateral facet arthrosis [at] L5-S1," "disc height loss and spondylosis [at] all levels," "[g]rade

1 anterolisthesis of L4 on L5 [that] measures 4.6 mm [and] remains stable throughout flexion and

extension," and "[g]rade 1 retrolisthesis of L3 on L4 [that] measures 2 mm and remains stable

throughout flexion and extension." R. 710. Although there were "[m]ulitlevel degenerative

changes" in Jerry's lumbar spine, there was "[n]o evidence of mechanical instability." *Id.* Jerry

had a lumbar MRI in April. *See* R. 705–09. The findings included "[m]ild levoconvex curvature

with apex of curvature at L2," "chronic degenerative endplate irregularity at multiple levels,"

"degenerative endplate edema with associated postcontrast enhancement at L2-3 and L3-4 [and]

degenerative endplate edema at L4-5 and L5-S1," the "overall appearance of short pedicles," and

"straightening of the normal lumbar lordosis." R. 707. Jerry's "vertebral heights [were] overall

well preserved." *Id.*

A few days later, Jerry returned to the Carilion Clinic complaining of chronic lower back

pain and left leg pain. R. 477–79. On exam, he displayed no deformity in his lumbar spine and

no edema in his extremities; was able to walk without a limp, list or pelvic tilt; and had normal

muscle strength and tone. R. 479. Gregory Howes, D.O., ordered a CT scan of Jerry's lumbar

spine, and he and Jerry "discussed core strengthening, [p]hysical therapy, anti-inflammatories,

pain meds and possible injections for improving chronic pain." *Id.* They also "discussed the

possible need for surgery" and that "[t]he surgery may or may not help with all pain issues and

symptoms." *Id.*

Later in April, Jerry presented to the Roanoke Wound Care Center seeking treatment for

a wound on his left foot he had noticed two weeks earlier. R. 1223–26. On exam, Jerry displayed

a weak protective sensation, and "mild pretibial, perimalleolar and dorsal foot edema," but his

dorsalis pedis and posterior tibial both had "2+ (normal) bilateral" strength. R. 1225. The

diabetic wound was debrided and cleaned, and Jerry was instructed to wear a "forefoot

offloading shoe" to reduce weightbearing on the left foot. *See* R. 1225–26.

8

In May, a CT scan was performed on Jerry's lumbar spine. R. 705. The "overall findings
[were] comparable" to his MRI and demonstrated "multilevel degenerative disc disease with
vacuum phenomenon throughout." *Id.* The CT scan showed the presence of "significant
protrusion of disc material posteriorly with associated bony spurring," "significant multilevel
facet and ligamentous hypertrophy," "significant spinal lateral recess and foraminal stenosis,"
and there "appear[ed] to be congenital spinal stenosis." *Id.* A few days after the CT scan, Jerry
returned to the Carilion Clinic, again complaining of chronic back pain and left leg pain "that can
be severe." R. 470. An examination revealed no deformities in his lumbar spine or lower
extremities, no edema in his extremities, normal muscle bulk and tone, no abnormalities in his
gait, and his sensation was symmetric to touch and pinprick in the extremities bilaterally. R. 472.
Jerry agreed to undergo a decompressive lumbar laminectomy ("DLL"), despite knowing the
surgical procedure "may or may not help with [his] pain issues and symptoms." R. 473.

In June, Jerry returned to the Carilion Clinic with similar complaints of back and leg
pain. R. 461–65. His "right leg pain [was] worse than his left and [went] down the side of [his]
leg to [his] foot." R. 462. Jerry also reported numbness and tingling, and said his pain was
"always there," although it got "worse at times." *Id.* He had "tried PT which helped some," and
took pain medication, but had stopped taking gabapentin "so he could feel his feet." *Id.* It was
also noted that "[d]espite conservative measures, [Jerry] continue[d] to experience debilitating
pain." *Id.* On exam, Jerry showed an active range of motion without pain in his extremities,
decreased sensation to light touch in the bilateral lower extremities, full motor strength
proximally and distally in his bilateral upper extremities, 4/5 strength proximally and distally in
his lower bilateral extremities, and "hyporeflexive" "muscle stretch reflexes" in his bilateral
lower extremities. R. 464. Jerry's gait was noted to be steady, midline, and antalgic, and no focal

defects were observed. *Id.* Jerry was diagnosed with lumbar stenosis, and he "sign[ed] surgical consent" forms for a DLL to be performed June 29, 2017. R. 465.

On June 26, Jerry presented to Roanoke Memorial Hospital again expressing concern over a non-healing diabetic ulcer on his left foot. R. 415; *see* R. 452. On exam, Jerry's dorsalis pedis and posterior tibial both showed "2+ (normal) right" strength, but his protective sensation was diminished. R. 417. His wound "probe[d] to soft bone," was "[m]oderately malodorous," and there was periwound erythema, seropurulent drainage, and tenderness to palpation around the wound. *Id.* It was noted that Jerry arrived with a straight cane prior to admission, R. 431, and that he "had [a] left big toe amputation last year for the same reason, but unfortunately [the] ulcer did not heal," R. 426. Parker Schmidt, M.D., determined that Jerry's diabetic foot wound required immediate transmetatarsal amputation ("TMA") of his left foot, R. 418, and the next day the remaining toes were amputated, R. 432.[6] Following surgery, Jerry began taking vancomycin, R. 435, and his pain was "overall controlled." R. 436. Jerry's wound was closed shortly thereafter and he was "free to discharge from a [p]odiatry stand point." R. 451. A discharge examination revealed no cyanosis or edema in Jerry's extremities, and palpable dorsalis pedis, posterior tibial, and radial pulses. R. 452. Jerry used a rolling walker to ambulate, and he ambulated with a hop to his gait pattern. R. 455.

By July 3, 2017, Jerry was "ready to go home," and an examination revealed no concerning findings aside from a decreased sensation in the plantar aspect of his right foot. R.

---

[6] In her decision, ALJ BaileySmith states that Jerry "underwent the amputation of two toes during the period at issue." R. 22. Although the surgical report does not specify which toes were removed in June 2017, *see* R. 432 ("The metatarsals were then amputated at the mid-diaphyseal level"), the record suggests that Jerry had all four of the remaining toes on his left foot amputated at that time. *See* R. 48 (Jerry's testimony that "I had a bunionectomy and then got a bone infection, and they had to take my big toe off, and about a year later, they had to take the rest of my toes off"); R. 440, 442 (pre-operative report noting TMA indicated for "second through fourth metatarsal heads," or "digits," on left foot).

456. Prior to discharge, Jerry consulted with Kellen Smith, PT. R. 457. His long-term plan was to

"be able to return to prior level of reported independence in 4 weeks to return to active lifestyle."

R. 457. PT Smith noted that Jerry was "eager for discharge" and "found to be [i]ndependent in

bed mobility, transfers and ambulation" with a rolling walker. R. 457. Jerry was instructed that

there was "[n]o Physical Therapy needed upon discharge," and PT Smith recommended that he

continue to use a rolling walker. *Id.*

A few days later, Jerry established care with Shyam Balakrishnan, M.D. R. 404–07. His

pain was controlled, but it was difficult for him to exercise or lose weight. R. 405. Jerry reported

a sensory change in his review of systems. R. 406. On exam, his left foot showed no drainage or

seeping, but he did have "[l]eft side post venous stripping, [that was] slightly bigger than [the]

right but [there was] no redness, warmth, [or] tenderness." R. 407. His diabetic foot infection

was deemed unstable, but there were "[n]o systemic signs [of] increased drainage, [or] pain." *Id.*

By July 17, Jerry was "doing very well," but had "2+ edema" and his "[p]rotective sensation

[was] absent." R. 402. He also contracted MRSA from the TMA. R. 403.

Jerry had a post-operative appointment in mid-August. R. 393–96. His pain was

controlled, but he again reported difficulty exercising and said if his foot "healed [] back better,"

he would "be able to do more." R. 394. He had a boot on his left foot, but his surgical wound

was "[h]ealing well with no redness, [or] warmth." R. 396. Later in August, Jerry's pain was

noted to be controlled with oral medications, and he denied experiencing any falls. R. 392.

On August 30, Jerry again presented to the Carilion Clinic with complaints of lower back

pain and leg pain. R. 387–90. He described the pain as "chronic and severe." R. 387–88. Exam

findings noted no deformities of the lumbar spine or lower extremities and no edema in the lower

extremities. R. 389. Jerry also had normal muscle bulk and tone, walked without a limp, list, or

pelvic tilt, and he had symmetric reflexes in his extremities. R. 390. Jerry again expressed that he wished to undergo a DLL. *Id.*

In mid-October 2017, Dr. Howes performed a rescheduled DLL on Jerry. R. 359–79. A pre-operative exam revealed a pain-free active range of motion in Jerry's extremities and no cyanosis or edema. R. 362. Jerry had a steady, midline, and antalgic gait, and no focal defects. *Id.* Prior to the surgery, Dr. Howes and Jerry "discussed at great length the risks, benefits, and alternatives to the procedure, including that of failure to improve." R. 363. Jerry was in stable condition following the surgery and was "[d]oing well postoperatively," R. 364, but his pain was "currently not well controlled," R. 365. On post-operative exam, Jerry showed normal flexion and extension, and his sensation to light touch was grossly intact. R. 365. At discharge, Jessica Conley, N.P., noted that Jerry "had a satisfactory hospital course and [was] currently ambulating without assistance," and that his "pain [was] well controlled with oral analgesics." R. 376. Jerry was evaluated by a physical therapist and was instructed to have "continued PT services after discharge." R. 370.

Later in October, Jerry's fiancée, Linda, called the Carilion Clinic, stating that Jerry had been in a lot of pain and requesting better medication. R. 356–57. Then, in early November, Jerry presented to the Carilion Clinic for a wound check and a surgical follow up to have staples removed. R. 354–55. Jerry reported that his pain had improved since his DLL and he was "having mostly incisional pain and some pain in his right lower back." R. 354. He "ha[d] been working with PT at home and [said] he [was] getting stronger," and he "denie[d] new weakness in his lower extremities." *Id.* On exam, Jerry displayed a stable gait, tenderness in the lumbar region, no sensory defects in the lower extremities, and chronic numbness in both feet. *Id.*

At his six-week follow up for his DLL in December, Jerry said he had been experiencing lower back pain and right buttock pain. R. 1020–23. He also complained of lower back pain at a follow up in January 2018. R. 1017–19. At that time, Jerry was "[d]oing reasonably well after surgery," and no concerning examination findings were reported. R. 1019. An X-ray of Jerry's lumbar spine performed that day revealed "[n]o acute lumbar spine osseous abnormality;" "[s]ignificant decrease in the disc space at L3-L4 and L4-L5" and '[m]oderate decrease in the disc space at L1-L2 and L2-L3," which was interpreted as "[p]rominent degenerative disc disease and facet disease at multiple level[s];" "[m]ild scoliosis in the midlumbar spine;" and "[s]table 5 mm retrolisthesis of L3 over L4." R. 1025.

At an April 2018 appointment for his diabetes, Jerry again reported back pain. R. 1013–16. He "denie[d] any cardiac or neurological symptoms," and reported that he was seeing pain management and that Zanaflex "helped with [his] symptoms." R. 1013. He had recently obtained insurance. *Id.* Examination revealed no obvious deformity of the lumbar spine, Jerry had normal reflexes and muscle tone, and he was able to "climb up [the] exam table." R. 1015. Jerry was diagnosed with benign hypertension, type two diabetes mellitus, and chronic midline low back pain with sciatica. R. 1016. In May, Jerry again returned to the Carilion Clinic for back and leg pain. R. 1086–89. The progress notes stated that Jerry "was still having some back pain but he has improved overall." R. 1086. Examination findings were normal, and after discussing "further work-up and surgical considerations," Jerry said, "[h]e would like continued conservative care at this time," including seeing pain management. R. 1089.

Shortly thereafter, Jerry had an appointment with the Carilion Chronic Pain Management Clinic for his lower back and leg pain. R. 1080–86. He "describe[d] the pain level to be running at 8 most [] days," but said it "can be up to 10 on his worst day, and can go down to 6 on a good

day." R. 1081. Felicia Harrell, N.P.-C. listed sitting, standing, driving, and bending as exacerbating factors, and she listed medication and PT as alleviating factors. *Id.* Jerry was no longer taking opioids, but he was taking NSAIDs/Acetaminophen, TCAs/SSRIs, muscle relaxants, and anticonvulsant/membrane stabilizers to treat various medical conditions. *Id.* On exam, Jerry had a negative straight leg raising test, tenderness to palpation in the lumbar region, 5/5 strength in all motor groups in the bilateral lower extremities, and steady gait. R. 1085. Nevertheless, the examination also revealed a limited range of motion in Jerry's lumbar spine, discomfort with flexion and extension of the lumbar spine, positive facet loading, and paraspinal tenderness bilaterally. *Id.* In her assessment, NP Harrell noted that she and Jerry had discussed PT and injections, but that Jerry had declined both. R. 1085. Jerry would let her know if he was interested in trying a spinal-cord stimulator ("SCS"). *Id.* She assessed chronic lower back pain with bilateral sciatica, morbid obesity, degeneration of the lumbar or lumbosacral intervertebral disc, facet degeneration of the lumbar spine, and lumbosacral spondylosis without myelopathy. *Id.*

In June, Jerry presented to the Carilion Clinic for a follow up for his diabetes, reporting numbness and tingling, a skin lesion, and difficulty exercising because of foot pain. R. 1426–27. On exam, his extremities were well perfused, his back was non-tender to palpation, he was neurologically intact, and he had no significant rashes or nodules on his skin. *Id.* The second digit on his right foot was erythematous with a laceration to the distal interphalangeal joint, but the erythema did "not extend into [the] foot." *Id.* John Nelson, M.D., assessed type two diabetes mellitus and "[c]ellulitis of toe of right foot," prescribed Keflex, and noted that Jerry had a "[h]igh risk for worsening cellulitis." R. 1428.

In July 2018, Jerry saw William H'Doubler, M.D., of the Jefferson Surgical Clinic, reporting a "burning, shooting, acute, and improving" left medial thigh pain that was "sudden in onset, 2 weeks ago." R. 1460. Jerry said he had leg pain when walking and swelling, and he complained of arthritis, and aches, pain, weakness and numbness in his feet, back, hips, and knees, as well as muscle weakness. *Id*. On exam, venous findings included phlebitis and a negative ulceration, and "bulging and varicosities" were observed on Jerry's left leg. R. 1461. His gait was normal, and Dr. H'Doubler noted that he had healed from his transmetatarsal amputation. *Id.* He diagnosed pain in the varicose veins of the bilateral lower extremities, chronic venous insufficiency, and embolism and thrombosis of the superficial veins of the left lower extremity. *Id.* Jerry also had imaging performed on his lower extremity venous duplex. *See* R. 1468–69. On the left, there was acute superficial thrombophlebitis "of a thigh level saphenous vein in addition to calf and thigh level varicosities," that did "not appear to extend into the deep venous system." R. 1468. There were "no signs of deep vein thrombosis." *Id.*

Jerry returned to the Jefferson Surgical Center in August for a follow-up scan, expressing nearly identical complaints, except that he now also complained of blood clots and no longer complained of muscle weakness. R. 1455–57, 1465–66. Examination findings were unchanged. R. 1456. Imaging of Jerry's lower extremity venous duplex showed "[c]hronic fibrosis of the greater saphenous or an accessory greater saphenous at the proximal thigh." R. 1466. The "deep and superficial venous systems appear[ed] patent and compressible," there was again "no evidence of deep venous thrombosis," and the "[c]ontralateral common femoral waveform demonstrate[d] iliac patency." *Id.*

Jerry presented to the Carilion Clinic in September, seeking to establish care and obtain supplies for his continuous positive airway pressure ("CPAP") machine for his sleep apnea. R.

1408. Jerry's status-post transmetatarsal amputation, lumbar stenosis, and lumbar radiculopathy

remained active problems. R. 1408–09. At that time, Jerry denied fatigue and weakness, any

symptoms of a neurological impairment, and loss of balance. R. 1410. Examination findings

were normal, and William Zimmer, M.D., assessed type two diabetes mellitus, acute bacterial

bronchitis, and lumbar radicular pain. R. 1410–11. For Jerry's lumbar radicular pain, Dr. Zimmer

instructed him to continue Zanaflex and Neurontin, and to return in three months. R. 1411.

Jerry saw Dr. Zimmer again in December 2018 after having trouble obtaining supplies for

his CPAP machine. *See* R. 1390–1404. Dr. Zimmer noted that Jerry "does have a lot of spasms

in his back," R. 1393, but only obstructive sleep apnea and type two diabetes mellitus were

included in his diagnosis, R. 1395. By January 2019, however, Jerry again complained to Dr.

Zimmer of back pain. R. 1374. Jerry said "he [did] not walk well because of the partial

amputation of his left foot," R. 1377–78, and he thought the amputation "may have exacerbated

his back pain," R. 1378. Jerry had been taking Neurontin, "which in the past ha[d] helped his

back pain," but he was "having worsening pain going down the back of the right leg," and

"[w]onder[ed] if there [was] something he c[ould] get for his pain that is not an opiate." *Id.* Jerry

did "not want any more shots and [did] not want any surgery." R. 1378. Nonetheless, Dr.

Zimmer provided Jerry with a shot of Depo-Medrol, prescribed Voltaren, increased Jerry's

Neurontin dosage, and instructed Jerry to follow up in three weeks. R. 1380 ("Was given a shot

of Depo-Medrol.").

In June 2019, Jerry saw Dr. Zimmer for a check-up relating to his diabetes. R. 1354–73.

Dr. Zimmer noted that he "does have chronic back pain." R. 1357. Jerry had been taking

Neurontin and over-the-counter Goody powders for his pain, but "state[d] Naprosyn has helped

him" and wanted a prescription if his physicians felt it would provide more relief than Goody

powders. R. 1357–58. Examination findings were normal, and Dr. Zimmer diagnosed lumbar radicular pain, spinal stenosis of the lumbar region, and type two diabetes mellitus with a foot ulcer. R. 1359. Dr. Zimmer then replaced Jerry's Goody powders with prescription Naprosyn, increased his dosage of Neurontin, and instructed Jerry to return in two months. R. 1360.

Dr. Zimmer also completed a form medical assessment of Jerry's functional abilities. R. 1351–53 (June 26, 2019). Dr. Zimmer opined that Jerry could sit, walk, and stand for only fifteen minutes at a time, walk for one hour total, and sit and stand each for two hours total in an eight-hour day. R. 1351. Dr. Zimmer also found that Jerry needed to lie down for at least thirty minutes at a time, and at least an hour total during an eight-hour workday. *Id.* He determined Jerry could "never" lift/carry more than twenty pounds, could "rarely" lift twenty pounds, could "occasionally" lift ten to nineteen pounds, and could "frequently" lift up to nine pounds. R. 1352 ("Note: In terms of an 8 hour workday: 'rarely' means about 4 times per 8 hour workday or about once every two hours, 'occasionally' means very little up to 33% (very little up to 1/3 (about 2 hrs) of the day), 'frequently' means 34% to 66% (1/3 to 2/3 (2 to 5 hrs) of the day) and 'continuously' means 67% to 100% (2/3 to full day (5 to 8 hrs)).")). Further, Jerry could rarely carry six to twenty pounds, and could occasionally carry up to five pounds. *Id.* Jerry could use both hands for repetitive actions, R. 1352, but could not use his feet for repetitive movements as in pushing and pulling leg controls, R. 1353. Dr. Zimmer also found that Jerry was unable to bend, crawl, or climb, and he could only occasionally squat or reach. *Id*. He concluded that Jerry had no restrictions on his exposure to moving machinery and driving automotive equipment, he could tolerate "mild" "[e]xposure to marked changes in temperature and humidity," he could not tolerate any exposure to unprotected heights, and he was either totally restricted from, or could

17

tolerate only "moderate," exposure to dust, fumes, and gases. *Id.* (marking both "Moderate" and "Totally Restricted" for "[e]xposure to dust, fumes, & gases").

On June 18, Jerry presented to Dr. H'Doubler, complaining of fatigue, leg and ankle swelling, leg pain with walking, back pain and aches, and pain, weakness, and numbness in his feet and arms. R. 1452–54. Jerry also expressed that he had been experiencing issues with balancing and headaches. *Id.* Jerry's left venous exam revealed bulging, edema, and varicosities. R. 1453. Dr. H'Doubler diagnosed unspecified leg pain, chronic venous insufficiency, and pain in the varicose veins of the bilateral lower extremities. R. 1453. He also ordered further imaging to be performed on Jerry's venous duplex. *Id.*

In July, the imaging was performed. *See* R. 1463–64. In his impression, James Callis, M.D., observed that Jerry's "deep and superficial venous systems appear[ed] patent and compressible," and that there was "no evidence of deep venous thrombosis (DVT) or thrombophlebitis." R. 1464. He noted "[m]inute chronic venous fibrosis involving the proximal thigh greater saphenous vein," and "reflux within the deep venous system at the" common femoral and popliteal veins. *Id.* Reflux was observed in the great saphenous vein at the saphenofemoral junction, the proximal thigh, the mid thigh, and the distal thigh, and "[c]alf varicosities confluence[d] into the great saphenous vein," but the "[s]mall saphenous vein [was] without reflux." *Id.* Dr. H'Doubler's examination findings were unchanged, as was his diagnosis. R. 1448. Dr. H'Doubler noted that Jerry had "ongoing symptoms of venous insufficiency including aching, heaviness, and tiredness, especially by the end of the day," and that his "symptoms [were] affecting [Jerry's] ability to work and function effectively." R. 1449. He also noted that Jerry had worn a prescription compression stocking for at least three months, and that

"[d]espite compliance with the prescribed stocking and modification of ADLs including exercise and leg elevation," Jerry "still ha[d] disabling symptoms." *Id.*

2.   *Medical Opinion Evidence*

In May 2018, DDS medical expert William Rutherford, Jr., M.D., opined that Jerry's chronic lower back pain with bilateral leg pain and TMA limited him to occasionally lifting and/or carrying twenty pounds, frequently lifting and/or carrying ten pounds, and standing and/or walking and sitting about six hours each in an eight-hour workday. R. 164, 174. Additionally, Dr. Rutherford found that these impairments limited Jerry to occasionally climbing ramps/stairs, stooping, kneeling, crouching, and crawling; and never climbing ladders, ropes, or scaffolds. R. 165, 175. Dr. Rutherford also opined that Jerry should avoid even moderate exposure to hazards. R. 166, 176. In July 2018, DDS expert Michael Koch, M.D., affirmed these findings. R. 189–91, 201–03.

3.   *Jerry's Statements*

In April 2018, Jerry submitted a Function Report to DDS. *See* R. 291–98. He explained that his transmetatarsal amputation and back pain made it difficult to stand, walk, sit, kneel, bend, lift, squat, reach, and climb stairs. R. 296. His typical day consisted of fixing a bowl of cereal in the morning, getting dressed, and watching television and playing computer games. R. 291. Jerry helped his fiancée tend to her chickens and care for her dog, but her grandsons helped him with those chores. R. 292. Because of his impairments, he could no longer carry the chicken feed or walk for exercise. *Id.* Jerry experienced significant trouble sleeping and had to sit down to shave and shower, and routine daily tasks like getting dressed and tying his shoes were more difficult. *Id.* Jerry was no longer able to prepare meals other than cereal. R. 293. He folded towels three times a week, but he did not do yardwork because he had trouble balancing. R. 293–

19

94. Jerry could drive, and he grocery shopped once every two weeks, but only for four to five

items for about an hour. R. 294; *see also* R. 483 (P.A. Seelig noting that Jerry "states he uses a

shopping cart to lean on when shopping because he cannot walk long distances"). Jerry's only

hobbies were watching television and playing computer games, which he did daily. R. 295. Jerry

used a cane and an insert "for toe replacement" in his left shoe daily. R. 297.

In July 2018, Jerry's fiancée, Linda, submitted a Third-Party Function Report to DDS. R.

309–19. She reported that Jerry's impairments made him unable to walk and exercise like he

used to, making it difficult to control his diabetes. R. 310. Leg cramps affected Jerry's sleeping.

R. 311. He continued to prepare simple meals, such as oatmeal, sandwiches, and cereal, but it

took two to three times longer than before. R. 312. His balance problems prevented him from

doing yardwork without assistance. *Id.* Jerry could drive. R. 314. He shopped in grocery stores

every couple of months for about an hour and a half for five or six items. *Id*. Jerry could walk

only three blocks before needing to rest, and he continued to use a cane. R. 316–17.

In August 2019, Jerry testified at a hearing before ALJ BaileySmith. R. 35–71. He and

Linda still split time between both of their homes. R. 37–39. Linda drove the first thirty minutes

to the hearing, and Jerry drove the last twenty minutes. R. 39–40. Jerry had not worked since

2013. R. 41. He described his diabetes as "somewhat" controlled, stating, "it doesn't stay in

range like it ought to." R. 43. Jerry was taking muscle relaxers for his back, which helped "a

little bit," R. 44, and took various medications for his diabetes, R. 42–44. When asked about

being checked for deep vein thrombosis, Jerry said he was waiting to schedule a surgery to

"close the vein off." R. 45–46. His degenerative disc disease "cause[d] pain in both [his] legs,"

he had fallen two days prior, and it was "just excruciating to get around sometimes." R. 47. He

described his back pain as throbbing and burning, and he said it "runs down through like my

20

sciatic nerve is what it feels like." *Id.* His pain was usually an eight-out-of-ten, but it was worse

on the day of the hearing because of his recent fall. R. 47–48. His toe amputation caused

problems balancing, R. 48, 51, made it difficult to bend, R. 49–50, and made it "so easy for

[him] to fall," R. 51. Jerry had diabetic neuropathy in his calf and finger that felt like "electric

pulses" going through him, rendering him unable to feel or grab anything. R. 52–53.

*B.      The ALJ's Decision*

ALJ BaileySmith summarized some of this evidence in her decision. *See generally* R.

19–24. At step two, she found that Jerry's status-post TMA of the left foot, type II diabetes with

peripheral neuropathy, lumbar degenerative disc disease, and obesity were "severe" impairments

after August 30, 2016, because they "significantly limit[ed] the ability to perform basic work

activities," R. 18, which according to the regulations include physical functions like "walking,

standing, sitting, lifting, pushing, pulling, reaching, [and] carrying," 20 C.F.R. § 404.1522(b)(1).

At step three, she found that Jerry "had two toes amputated on his left foot in February[] 2016

and June[] 2017," R. 19, and that his gait was "generally within normal limits" with "no

evidence that he cannot . . . balance while standing or walking," R. 20. *See also* R. 19 ("[W]hile

he demonstrated occasional abnormal gait, providers often noted that his gait was stable with no

limp." (citations omitted)).

In determining Jerry's RFC, ALJ BaileySmith first summarized Jerry's testimony that he

"is not able to work due to back pain, feet pain, and difficulty standing, walking, sitting and

lifting," he "has numbness and tingling in his fingers and cannot do as much with hands

anymore," his "daily activities include[d] getting outside and watching television," and his many

medications helped his symptoms but did not eliminate them. R. 21. She also observed that

Linda "stated in a Function Report that [Jerry] plays computer games, helps care for chickens,

gathers eggs, folds clothes, goes out alone, drives, shops in stores, and can handle his financial

accounts." R. 21–22. ALJ BaileySmith then briefly summarized Jerry's medical records. R. 22;

*see* R. 23–24 (separately discussing medical opinions). She determined that although Jerry's

"medically determinable impairments could reasonably be expected to cause the alleged

symptoms," his "statements concerning the intensity, persistence and limiting effects of these

symptoms [were] not entirely consistent with the medical evidence and other evidence in the

record for the reasons explained [elsewhere] in [the ALJ's] decision." *Id.*

      First, ALJ BaileySmith reasoned that although Jerry "testified that he cannot maintain

employment because he has back pain, feet pain, and numbness and tingling in his hands and feet

that make standing, walking and sitting for prolonged periods difficult," and "[h]e struggles to

complete even routine daily tasks," "[t]he objective evidence . . . does not fully support these

statements." *Id.* She found that "[e]xaminations infrequently revealed abnormal gait, and

occasional skin lesions with cellulitis of the right foot," and that "[t]hese abnormalities are not

present consistently, and often, the claimant demonstrates good neurologic functioning and

coordination." *Id.* She did not cite any evidence in the record to support those findings. *See id.*

      Next, ALJ BaileySmith reasoned that Jerry had "received regular treatment for his

physical impairments, but other than his lumbar decompression and [partial] toe amputation, this

care has been quite conservative, consisting of oral medications." *Id.*; *see id.* ("He underwent the

amputation of two toes during the period at issue[.]"). Third, Jerry "had been advised to consider

injections and physical therapy, but declined both modes of treatment, suggesting he is not

experiencing the extent of symptoms alleged." R. 22–23. Lastly, ALJ BaileySmith noted Jerry's

ability to "drive, shop in stores, fold clothes, watch television, and go outside regularly" in

support of her conclusion that "[a]lthough [Jerry] does experience some symptoms because of

his impairments, the objective findings contained in the record, the conservative care he has

received and his admitted ability to perform a variety of daily tasks all suggest that these

symptoms are not as severe or limiting as he claims." R. 23. Instead, ALJ BaileySmith concluded

that "the symptoms associated with his degenerative dis[c] disease," the "problems" attributable

to his diabetic peripheral neuropathy, and his obesity-related pain and fatigue "limited him to

work at the light exertional level and further affected his abilities to perform postural tasks and

work around unprotected heights or workplace hazards," R. 22, to the extent reflected in her RFC

finding, *see* R. 21, 24.

C.      *Analysis*

        Jerry challenges ALJ BaileySmith's denial of benefits, asserting that her credibility

determination as part of the RFC assessment is not supported by substantial evidence. *See*

*generally* Pl.'s Br. 2–4. The regulations set out a two-step process for evaluating a claimant's

alleged symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. §§ 404.1529, 416.929. "First, the ALJ

looks for objective medical evidence showing a condition that could reasonably produce the

alleged symptoms," *Lewis*, 858 F.3d at 866, "in the amount and degree[] alleged by the

claimant." *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Step One is a "threshold" inquiry at

which the "'intensity, persistence, or functionally limiting effects' of the claimant's asserted

pain" are not considered. *Id.* Assuming the claimant clears the first step of the *Craig* analysis, the

ALJ moves on to Step Two. There, "the ALJ must evaluate the intensity, persistence, and

limiting effects of the claimant's symptoms to determine the extent to which they limit the

claimant's ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing basis, *Mascio v.*

*Colvin*, 780 F.3d 632, 637 (4th Cir. 2015); *Hines*, 453 F.3d at 565; *see also* SSR 16-3p, 2016 WL

1119029, at *4 (Mar. 16, 2016). "The second determination requires the ALJ to assess the

credibility of [subjective] statements about symptoms and their functional effects," *Lewis*, 858

F.3d at 866, after considering all the relevant evidence in the record, 20 C.F.R. §§ 404.1529(c),

416.929(c). "At this step, objective evidence is *not* required to find the claimant disabled."

*Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020) (citing SSR 16-3p, 2016

WL 1119029, at *4–5). Rather, a claimant "[h]aving met his [or her] threshold obligation of

showing by objective medical evidence a condition reasonably likely to cause the pain" or other

symptoms alleged is then "entitled to rely exclusively on subjective evidence to prove the second

part of the test, *i.e.*, that [the] pain is so continuous and/or so severe that it prevents him [or her[

from working a full eight hour day." *Hines*, 453 F.3d at 565 (footnotes omitted).

     The ALJ must give specific reasons, supported by "references to the evidence," for the

weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL

5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5 (July

2, 1996)). But because "[s]ymptoms cannot always be measured objectively through clinical or

laboratory diagnostic techniques," an ALJ "may 'not disregard an individual's statements about

the intensity, persistence, and limiting effects of symptoms solely because the objective medical

evidence does not substantiate' them." *Arakas*, 983 F.3d at 95 (quoting SSR 16-3p, 2016 WL

1119029, at *4–5); *see* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). A reviewing court will

uphold the ALJ's credibility determination if his or her articulated rationale is legally adequate

and supported by substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F.

App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.32 1007, 1011 (4th Cir. 1997)).

     Under this standard, I cannot find that ALJ BaileySmith's credibility analysis is

supported by substantial evidence. ALJ BaileySmith discounted Jerry's reports of symptoms and

limitations because: (1) relevant abnormalities were "not present consistently" or "infrequently"

observed on unidentified examinations and Jerry "often" demonstrated good neurologic functioning and coordination, R. 22; (2) aside from his lumbar decompression and toe amputation, his treatment was "quite conservative," *id.*; (3) he declined both PT and lumbar injections after being advised to consider them, *id.*; and (4) he was able to drive, shop in stores, fold clothes, watch television, and go outside regularly, R. 23. During the relevant period of alleged disability, Jerry continued to suffer complications from the February 2016 amputation of his big toe and had the remaining toes on his left foot amputated because of complications with diabetes, and he had lumbar surgery—his third altogether. After Jerry's back surgery, imaging of his spine showed significant degenerative disc disease and facet disease at multiple levels of his lumbar spine. Weighing more than 350 pounds, Jerry was morbidly obese. The record contains over 1000 pages of medical evidence documenting his symptoms, signs, treatment, and functional limitations. Yet, the ALJ discussed the treatment notes in just three short paragraphs before concluding, "[t]he objective evidence, however, does not fully support" Jerry's claimed symptoms and limitations. R. 23. The ALJ's conclusion may ultimately be correct, but given the depth and complexity of Jerry's severe impairments, the ALJ's discussion and analysis are plainly inadequate to allow this Court meaningful review of her conclusion. Moreover, the ALJ's remaining three reasons do not withstand scrutiny.

The ALJ's finding that, other than Jerry's lumbar decompression surgery and amputation of two toes, his treatment was "quite conservative," R. 22, is not a reasonable basis for discrediting Jerry's subjective complaints of pain and physical limitations. It is well-established that an ALJ may properly consider the nature of a claimant's treatment when assessing his credibility. *See* 20 C.F.R. §§ 404.1529(c)(3)(v), 416.1529(c)(3)(v) ("Factors relevant to your symptoms, such as pain, which we will consider include . . . [t]reatment, other than medication,

you receive or have received for relief of your pain or other symptoms."). The record shows that

Jerry engaged in physical therapy for many years. He also received injections and was prescribed

pain medications. Such treatments are arguably conservative. *See Allen v. Saul*, No. 3:20cv291,

2021 WL 955575, at *16 n. 4 (S.D. W. Va. Feb. 23, 2021) (noting intra-circuit unclarity

regarding what constitutes "conservative treatment" and citing differing opinions as to whether

epidural injections should be deemed conservative). Before the relevant period, Jerry had two

back surgeries and his big toe amputated, neither of which can be considered "conservative

treatment." *See Smith v. Colvin*, No. 2:24cv3424, 2016 WL 11407771, at *8 (D.S.C. Jan. 27,

2016) (two back surgeries); *cf.* 20 C.F.R. §§ 404.1530(c)(5), 416.930(c)(5) (providing as a matter

of law that claimants will not be denied disability benefits solely for "failing to follow treatment"

that "involves amputation of an extremity, or a major part of an extremity"). During the relevant

period, he had the rest of his toes on his left foot amputated, and he had a third back surgery.

Despite this history of significant invasive treatment, the ALJ found that Jerry's treatment

suggested he was "not experiencing the extent of symptoms alleged." R. 23. In support of this

finding, the ALJ noted that Jerry had declined physical therapy and an injection. While it is

accurate that Jerry once declined physical therapy and injections, which were suggested by a

nurse practitioner, this is an exceedingly weak reason when compared to the years of significant,

and sometimes invasive, non-conservative, treatment that Jerry has undergone. The ALJ simply

has not come close to explaining how one instance of Jerry declining suggested, arguably

conservative treatment that he had pursued many times throughout the longitudinal treatment

record shows that his symptoms were not as severe as alleged. *Cf. Judy T. v. Comm'r of Soc.*

*Sec.*, No. 4:18cv28, 2019 WL 4383140, at *10 (W.D. Va. July 25, 2019) ("[T]he fact that Judy

reported feeling well for a few weeks after restarting Pristiq does not support the ALJ's finding

that her symptoms 'stabilized' with medications."), *adopted*, 2019 WL 4345375 (W.D. Va. Sept.

12, 2019); *Vincent v. Colvin*, No. CIV-15-610, 2016 WL 5373031, at *7 (W.D. Okla. Sept. 26,

2016) (ALJ's failure to consider claimant's "isolated comments" that she "'was doing well'"

after hip surgery "in the context in which they were made," including that the claimant still

walked with a limp and occasionally used a walker at the time she made the report, precluded

substantial-evidence review). Accordingly, I cannot find that the ALJ's decision to question the

severity of Jerry's symptoms as inconsistent with his treatment record is supported by substantial

evidence.

Lastly, ALJ BaileySmith's reliance on Jerry's activities of daily living does not support

her RFC determination. While an ALJ may properly consider a claimant's daily activities when

assessing the credibility of his alleged symptoms, *see* 20 C.F.R. §§ 404.1529(c)(3)(i),

416.929(c)(3)(i), the ALJ must consider the type of activities performed as well as the extent to

which the claimant can perform them. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018).

"The 'critical differences between activities of daily living and activities in a full-time job are

that a person has more flexibility in scheduling the former than the latter, can get help from other

persons . . . , and is not held to a minimum standard of performance, as [he] would be by an

employer.'" *Tanzi F. v. Saul*, No. 3:19cv167, 2021 WL 3205050, at *6 (E.D. Va. July 8, 2021)

(quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)).

Here, although the ALJ observes that Jerry "is able to drive, shop in stores, fold clothes,

watch television, and go outside regularly," she does not offer an explanation as to how these

activities reflect Jerry's ability to perform full-time work. *See* R. 23 ("Finally, the claimant is

able to drive, shop in stores, fold clothes, watch television, and go outside regularly."); *see also*

*See Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) ("The [ALJ's] casual equating of

household work to work in the labor market cannot stand."). Moreover, Jerry and his fiancée reported significant limits on his abilities to perform many of these activities. *See Woods*, 888 F.3d at 694 ("An ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which [he] can perform them.").

For instance, although Jerry testified that he was able to grocery shop, he qualified his ability to do so. He shopped for a list of four to five items once every two weeks for about an hour, R. 294, and he needed to lean on the shopping cart for support, R. 483. Additionally, while Jerry said that he sometimes goes outside multiple times a day, he also said that he does not go outside at all on some days. R. 294; *see also* R. 42 (Jerry testifying that he can no longer do certain outdoor activities, including camping and fishing); R. 292 (Jerry stating that he could no longer carry chicken feed); R. 293–94 (Jerry explaining that he cannot do yardwork because of trouble balancing); R. 296 (Jerry reporting that he could walk only half a block before needing to rest); R. 316 (Linda reporting that Jerry could walk only three blocks before needing to rest). Furthermore, it is unclear how the fact of going outside alone, without any accompanying functional activity, reflects Jerry's ability to perform work-related tasks. *Arakas*, 983 F.3d at 99 ("[T]he ALJ failed to adequately explain how [his] limited ability to carry out daily activities supported [her] conclusion that [he] could sustain an eight-hour workday."). The same can be said regarding Jerry's ability to fold clothes, and regularly watch television and play computer games. While the activity of folding clothes has some apparent relation to a work-like activity if done for a significant amount of time, which the record does not suggest, the ALJ did not explain how watching television or playing computer games equated to work-like activities or were somehow inconsistent with Jerry's claimed functional limitations.

28

Additionally, Jerry's ability to drive also appears limited as he testified that he and Linda split the fifty-minute drive to the hearing. R. 39–40. Nonetheless, even assuming Jerry's ability to drive is unlimited, ALJ BaileySmith again provides no explanation for how it reflects Jerry's functional capacity to complete an eight-hour workday. *See Jason W. v. Saul*, No. 7:19cv352, 2020 WL 5578969, at *6 (E.D. Va. Sept. 17, 2020) ("[The] ALJ should have explained how his ability to drive short distances supports a conclusion that he can do light work[,] but did not do so."). The ALJ may have had a reason for determining that these tasks reflected that Jerry's symptoms were not as severe as alleged. If that were the case, however, she was required to explain how she reached that conclusion. *See id.* Here, no such explanation was offered. Thus, ALJ BaileySmith's conclusion that Jerry's daily activities reflect that his symptoms are not as severe as alleged likewise is not supported by substantial evidence.

\* \* \*

I take no position on whether Jerry is entitled to disability benefits for the relevant period. But this Court must not "reflexively rubber-stamp [the] ALJ's findings." *Lewis*, 858 F.3d at 869. On remand, the Commissioner must consider and apply the applicable legal rules to all the relevant evidence in the record; explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination; and, assuming Jerry cannot prove that he was disabled based on the medical evidence alone, provide a logical link between the evidence the Commissioner found credible and the RFC determination.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Jerry's Motion for Summary Judgment, ECF No. 18, **DENY** the Commissioner's Motions for Summary Judgment, ECF Nos. 21, 22, **REVERSE** the Commissioner's final

decision, **REMAND** the case for further administrative proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding district judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: January 31, 2022

Joel C. Hoppe
United States Magistrate Judge